[Cite as *State v. Cunningham*, 2026-Ohio-2772.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2025-P-0047 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| ERIK A. CUNNINGHAM, | Trial Court No. 2019 CR 00022 |
| Defendant-Appellant. | |

## OPINION AND JUDGMENT ENTRY

Decided: July 20, 2026
Judgment: Affirmed

*Connie J. Lewandowski*, Portage County Prosecutor, and *Daniel Sallerson*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Daniel D. Eisenbrei*, Milligan Pusateri Co., L.P.A., 4686 Douglas Circle, P.O. Box 35459, Canton, OH 44735 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Erik A. Cunningham, appeals the judgment of the Portage County Court of Common Pleas, convicting him, after a trial to the bench, of murder, with two firearm specifications. Mr. Cunningham did not dispute that he murdered the victim, his wife, L.C., but, instead, asserted the affirmative defense of not guilty by reason of insanity ("NGRI"). At issue is whether the trial court erred in concluding that Mr. Cunningham failed to establish, by a preponderance of the evidence, the defense of NGRI and whether the trial court committed prejudicial error by allowing an expert to testify to

the out-of-court statements of another expert in alleged violation of the Confrontation Clause of the United States and Ohio Constitutions. We affirm the trial court's judgment.

## I. Introduction

{¶2} On December 31, 2018, Mr. Cunningham shot and killed his wife. This fact is not in dispute. Evidence demonstrated that L.C. was hit with a shot across her scalp, a shot to her clavicle, and a shot to her head. The autopsy report stated the cause of death as "[g]unshot wounds to the head and base of the neck." Several days later, on January 3, 2019, Mr. Cunningham voluntarily surrendered himself to the Portage County Sheriff's Office ("PCSO"), admitting his actions. Deputy Gary Hoffman spoke with Mr. Cunningham regarding his inculpatory statements. Deputy Hoffman did not have any suspicion that Mr. Cunningham was under the influence of any intoxicant at the time Mr. Cunningham arrived at PCSO.

{¶3} When the deputy asked, "[W]here did you shoot your wife?" Mr. Cunningham explained "I think I've said all I'm going to say about that[.]" When the deputy asked whether Mr. Cunningham was intoxicated or under the influence of an intoxicant at the time he arrived at PCSO, the latter responded in the negative. While at PCSO, Mr. Cunningham stated that he believed he was of "sound mind" at the time of the incident. He admitted, however, to using drugs. Mr. Cunningham specifically stated to PCSO staff that he used methamphetamine on the day of the incident. Investigators went to Mr. Cunnigham's home and confirmed L.C. was deceased. Mr. Cunningham was held at the Portage County Jail pending charges.

## II. Factual Background and Relevant Procedural History

{¶4} In 2018, Mr. Cunningham, his wife, L.C., and their children, two boys, ages seven and three, lived in Brimfield Township in a residential neighborhood. On December 30, 2018, the day before the incident, Mr. Cunningham called 911 because he apparently believed he was being spied upon. Officer Robert Putnam of the Brimfield Police Department responded to the call at Mr. Cunningham's home. When the officer arrived at the residence, he noticed the cable box was open and wires were exposed. The officer also noticed a Roomba vacuum taken apart and multiple children's toys disassembled in the garage of the home. Officer Putnam asked if Mr. Cunningham would be willing to speak with mental health providers at Coleman Health Services ("Coleman"). Mr. Cunningham agreed.

{¶5} Officer Putnam stated that he had confronted and addressed individuals with past methamphetamine use and such individuals tend to be "taken apart." Officer Putnam, however, admitted he had no objective basis to conclude Mr. Cunningham was under the influence of alcohol or any drug. His opinion was based solely on his prior experiences.

{¶6} Mr. Cunningham met with a pre-screener at Coleman, Kenneth Dampier. Mr. Dampier, at the relevant time in question, had an undergraduate degree in psychology and a master's degree in social work. He pointed out that he worked with law enforcement with "anybody . . . in a mental health crisis, if they were suicidal, homicidal, psychotic or anything like that . . . ." Mr. Dampier was tasked to determine whether Mr. Cunningham was a danger to himself, a danger to others, or he was unable to take care of himself. Mr.

Case No. 2025-P-0047

Dampier was essentially asked to determine whether Mr. Cunningham met the criteria for an involuntary hold at the treatment center. Mr. Dampier observed that:

> When individuals come to Coleman they have a dual diagnosis where they're dealing with both mental health and they're dealing with substance abuse. And sometimes when you're dealing with substance abuse they exacerbate symptoms that's going on. . . . So you're presenting to me as like psychotic, but you've never had a psychotic presentation, so it's like, is it substance induced or is this organic psychosis almost like.
>
> . . .
>
> There are four criteria[] for a pink slip. The first one is threats of suicide, acts of suicide[,] or with suicidal behavior. There is homicidal behaviors or threats to homicide. . . . The third one is inability to take care of yourself. . . . Or the fourth one is just would benefit from a higher level of care . . . or for monitoring.[1]

{¶7}   Mr. Dampier indicated that Mr. Cunningham did not exhibit or admit to any of these criteria. Mr. Cunningham's main focus during the interview was his concern that his cell phone had been "hacked." He did not indicate he and L.C. had any specific problems and did not demonstrate any unusual body language when Mr. Dampier brought up L.C.

{¶8}   Mr. Dampier stated that when intake occurs at Coleman, he evaluates that person for "[r]isk, imminent risk for themselves and the community as well." When Mr. Cunningham arrived at Coleman, he was assessed for "increased paranoia." Mr. Cunningham denied drug use "in general," but admitted using Suboxone. Nevertheless, Mr. Dampier confirmed that Mr. Cunningham had been previously treated with Suboxone.

---

1. The phrase "pink slip," in this context, refers to a formal manner in which an individual is involuntarily committed for hospitalization due to harm the individual might cause to others or him/herself.

Case No. 2025-P-0047

Mr. Dampier stated that prescribed Suboxone is used for those "that have usually an opioid background or like usually opioid polysubstance use background."

{¶9} Mr. Dampier stated that Mr. Cunningham did not exhibit any indications that he would hurt himself or others, nor did he present any auditory or visual hallucinations. Moreover, Mr. Cunningham did not report any sort of psychosis to Mr. Dampier other than paranoia. Mr. Dampier stated he spoke with Mr. Cunningham's parents (who brought him to Coleman on December 30, 2018), and neither parent relayed information that was "out of ordinary from what [Mr. Cunningham] said . . . or it would've been an issue for a pink slip." Mr. Dampier asserted neither parent indicated any concern with Mr. Cunningham's behavior and he documented nothing concerning any sort of psychosis during his interview.

{¶10} While Mr. Dampier recognized and noted Mr. Cunningham's possible drug use, which the former was aware might enhance his potential psychotic symptoms, he concluded Mr. Cunningham's situation did not justify an involuntary hold. Mr. Dampier determined that "there was nothing evident or overt to be seen for [Mr. Cunningham's] rights to be taken away." Indeed, under the circumstances, Mr. Dampier observed that he had no basis to believe that a second opinion regarding Mr. Cunningham's mental state, in light of his admissions, would require an involuntary commitment. Mr. Cunningham was therefore discharged.

{¶11} Mr. Cunningham returned home on December 30, 2018. During the day, Courtney Rose, a close friend of L.C., and her children visited the Cunningham residence. Ms. Rose spoke with L.C. in the garage, out of Mr. Cunningham's earshot. L.C., who was emotional during the conversation, explained that Mr. Cunningham had been acting

strangely. She also stated he accused her of cheating on him and that he had struck her several times. Ms. Rose stated she observed bruises on L.C.'s back and lumps on her head.

{¶12} The following evening, on December 31, 2018, L.C. was shot and killed by Mr. Cunningham in their garage. The eldest of their young children heard the gunshot and apparently observed his deceased mother in the garage. Mr. Cunningham, however, advised the child not to speak about the event. Nothing suggests the boy said anything after the incident.

{¶13} On January 1, 2019, Mr. Cunningham, his wife, and the children, were expected to attend dinner at his parents' residence. They did not arrive, but Mr. Cunningham explained to his mother ("N.C.") that L.C. was with her friends. N.C. drove to the Cunningham home, retrieved him and the two children. When she arrived, she noticed the "house was a mess." N.C. stated she spoke with Mr. Cunningham about his paranoia and "him shutting off the light in the basement and then it would be on again. And windows in the basement being open and he'd close them and then they'd be open again. Stuff like that, paranoid stuff."[2] Regardless of the disarray and unusual circumstances, Mr. Cunningham returned to his parents' home with the children. He fell asleep at his parents' home where he and the children remained throughout January 2, 2019.

---

2. It is not entirely clear what N.C. was describing regarding Mr. Cunningham "shutting off the light in the basement." Mr. Cunningham admitted, however, to Dr. Lynn Luna-Jones, a forensic psychologist who interviewed Mr. Cunningham after the incident, that, on the night of the murder, he "killed the power," and turned off the circuit breaker in order to "kill the cameras" that might be monitoring him. Mr. Cunningham told Dr. Luna-Jones, "I didn't want them to know where I was in the house." By "them," Mr. Cunningham indicated the police and "bad guys [were coming] to kill him."

Case No. 2025-P-0047

{¶14} On January 3, 2019, Mr. Cunningham's father, P.C., drove Mr. Cunningham and the children back to their home. Although Mr. Cunningham advised P.C. not to enter the garage, he did so and discovered L.C.'s lifeless body, surrounded in dried blood, on the garage floor. P.C. demanded Mr. Cunningham call 911. Mr. Cunningham, however, asked P.C. to drive him to PCSO and stated he would "take care of it."

{¶15} At approximately 8:30 p.m. on January 3, 2019, Mr. Cunningham entered the PCSO and spoke with a corrections officer, Deputy Gary Hoffman, at the front window. He explained that he had shot his wife on New Year's Eve and wished to speak with an officer. Deputy Hoffman did not believe Mr. Cunningham was under the influence of drugs or alcohol during their conversation. Deputy Hoffman indicated Mr. Cunningham admitted to using methamphetamine on New Year's Eve, 2018, the night of the murder.

{¶16} Dr. Brian Welsh, a forensic psychiatrist working with Coleman in conjunction with a contract with the Portage County Jail, met with Mr. Cunningham on January 15, 2019. Dr. Welsh noted that, during his interview, Mr. Cunningham was logical and effectively responded to questions. Dr. Welsh asserted that Mr. Cunningham presented no evidence of disorganized thinking which, in the doctor's opinion, is a symptom of psychosis. Dr. Welsh stated that, in Mr. Cunningham's intake form (dated January 4, 2019), nurse's notes demonstrate Mr. Cunningham "reports a history of intravenous methamphetamine use. That he uses for days and takes breaks, that it varies. And that his - - at least on January 4, 2019, he reports to [a nurse] that his last use of methamphetamine was actually - - [the nurse] typed the words New Year's Eve." The remainder of Dr. Welsh's statements and testimony will be discussed below.

Case No. 2025-P-0047

{¶17}   In January 2019, Mr. Cunningham was indicted on two counts of murder, two counts of felonious assault, along with firearm specifications on all counts relating to the shooting death of L.C. Mr. Cunningham entered a plea of NGRI and was tried to the bench. After a lengthy trial, Mr. Cunningham was found guilty on all counts. The trial court determined each substantive count merged for purposes of sentence, and the State elected to proceed to sentencing on one of the murder counts. The trial court also merged two of the firearm specifications. In total, Mr. Cunningham was sentenced to 15 years to life on the murder count and a total of six mandatory years on the two firearm specifications (three years each). Mr. Cunningham was therefore ordered to serve an aggregate term of 21 years to life in prison. This appeal follows.

{¶18}   Mr. Cunningham assigns two errors for this court's review. They shall be addressed in turn.

### III. First Assignment of Error: Was the Trial Court's Rejection of Mr. Cunningham's NGRI Defense Against the Manifest Weight of the Evidence?

{¶19}   Mr. Cunningham's first assignment of error reads:

{¶20}   "The trial court clearly lost its way and created a manifest miscarriage of justice by rejecting appellant's insanity defense against the manifest weight of the evidence."

{¶21}   Under this assignment of error, Mr. Cunningham claims the trial court erred to his prejudice when it determined he failed to establish the affirmative defense of NGRI. Specifically, he argues that the trial court created a manifest miscarriage of justice by rejecting the defense of NGRI based upon conjecture that his psychosis was a result of voluntary methamphetamine intoxication, despite the absence of toxicological evidence

of such intoxication, and the presence of severe mental disease which persisted years after the date of the offense. Mr. Cunningham also asserts, given his claimed psychoses, which were established, in his view, via the testimony of his experts, that the trial court lost its way when it concluded he knew the wrongfulness of his actions at the time of the incident. We do not agree.

### A. Legal Standards

{¶22} The manifest weight of the evidence standard guides the analysis of evidentiary support for an NGRI defense. *State v. Schmid*, 2025-Ohio-14, ¶ 20 (2d Dist.). In applying this standard, we bear in mind that the weight and credibility of evidence related to the insanity defense are decisions primarily left to the trier of fact, in this case, the judge. *See, e.g., State v. Thomas*, 70 Ohio St.2d 79, 80 (1982).

{¶23} A court considering whether a verdict is supported by the manifest weight reviews the entire record, "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence," the finder of fact clearly lost its way and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *State v. Wells*, 2012-Ohio-4459, ¶ 56 (11th Dist.), *see also State v. Thompkins*, 1997-Ohio-52, ¶ 25. "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶24} Insanity is an affirmative defense that the defendant must prove, and "'has no bearing on the sufficiency of the evidence'" to support the State's case. *State v. Moore,*

Case No. 2025-P-0047

2024-Ohio-994, ¶ 56 (6th Dist.), quoting *State v. Garrett,* 2022-Ohio-4218, ¶ 127. The defense of NGRI does not relieve the State of its burden to prove the elements of the charged offense(s), but it permits a defendant to present evidence sufficient to support the affirmative defense and obtain an acquittal on the ground of insanity. R.C. 2901.05(A) ("Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence . . . is upon the accused."). A person is NGRI "only if the person proves . . . that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14).

{¶25} "'Where the insanity is simply a temporary condition brought on by the voluntary ingestion of drugs or alcohol, it does not suffice to establish an NGRI defense.'" *State v. Bernardo*, 2025-Ohio-1399, ¶ 13 (5th Dist.), quoting *State v. Swanson*, 2014-Ohio-549, ¶ 14 (6th Dist.). *See also State v. Toth*, 52 Ohio St.2d 206, 210 (1977), ("It is a well-established rule in Ohio that the defense of insanity cannot be successfully established simply on the basis that the condition resulted from the use of intoxicants or drugs, where such use is not shown to be habitual or chronic." (Citation omitted.)), *overruled in part on other grounds, State v. Muscatello*, 55 Ohio St.2d 201, 203 (1978).[3]

---

3. We emphasize that Mr. Cunningham does not take issue with the sufficiency of the State's evidence on the murder charge. Mr. Cunningham conceded this point, and therefore we need not directly consider the sufficiency of the evidence on the primary, substantive charge.

Case No. 2025-P-0047

### B. Summary of Expert Testimony[4]

### 1. Expert Witnesses Supporting the State's Position

### a. Dr. Brian Welsh[5]

{¶26} As noted above, Dr. Welsh is a psychiatrist associated with the Portage County Jail. Dr. Welsh, a medical doctor with a specialty in forensic psychiatry, met with Mr. Cunningham on January 15, 2019. During the interview, Dr. Welsh observed Mr. Cunningham to be logical and coherent during his interview. He observed no unusual thinking and no indication of psychosis. Mr. Cunningham reported a history of hospitalization for psychiatric issues in 2010. Mr. Cunningham recognized he was psychiatrically hospitalized from March 4, 2010, through March 8, 2010, at St. Thomas Hospital in Akron, Ohio, following a drug overdose. Mr. Cunningham also reported he had a history of paranoia, but Dr. Welsh did not observe any such symptoms during his interview.

{¶27} Dr. Welsh was aware of Mr. Cunningham's substance use, including his use of methamphetamine. According to official notes taken from a nurse at the time of Mr. Cunningham's admission to the jail, Dr. Welsh observed Mr. Cunningham admitted to methamphetamine use on the day of the incident. Dr. Welsh cited the jail intake form that inquired into whether Mr. Cunningham "use[s] drugs not prescribed by a physician and it's marked yes. What kind? Answered methamphetamine. Method of use is IV, which is intravenous. How much? Varies. How often? Used for several days and then take a break

---

4. The transcript of proceedings has multiple volumes that occurred across many days. The transcript of proceedings, however, start each day of testimony with a new numerical sequence, i.e. "p. 1." Accordingly, this court shall provide a date of the testimony of each expert for ease of reference.
5. Dr. Welsh's testimony occurred during the proceedings that took place on June 4, 2025.

Case No. 2025-P-0047

for a day or two and restart. Last used New Year's Eve. And this is dated January 4, 2019."

{¶28} Dr. Welsh testified he utilized these notes during his interview with Mr. Cunningham. When the doctor asked Mr. Cunningham questions about his use of methamphetamine (for purposes of the psychiatric evaluation), the latter acknowledged using the drug at or around the time of the incident.

{¶29} Mr. Cunningham requested medication from Dr. Welsh to help him sleep and address his anxiety. The doctor obliged but stated the medications were not issued to quell or address psychotic episodes. Dr. Welsh stated that he prescribed no anti-psychotic medications because he did not "think an anti-psychotic would be necessary."

{¶30} Dr. Welsh testified that, while Mr. Cunningham did not appear to show any signs of psychosis, he did admit that, prior to the incident, he was concerned about statements made by L.C. Mr. Cunningham stated that "[s]tuff my wife would say wouldn't make sense." Dr. Welsh observed that

> even if someone reports paranoia[,] if I don't see any evidence of paranoia at the time and the person has disclosed using meth, then I usually wait for some time for the effects of the methamphetamine, which can cause psychosis, to wear off, so that I'm not unnecessarily prescribing medication.

{¶31} Dr. Welsh stated that when he does not see any evidence of psychosis or severe depression, which he did not perceive when he interviewed Mr. Cunningham, he would also look to a history of mental illness or long-term psychiatric treatment before prescribing any medication for these disorders. Dr. Welsh confirmed that Mr. Cunningham did not have "evidence of . . . long-term psychiatric treatment, long-term symptoms of schizophrenia and current evidence of schizophrenia." Accordingly, during his interview

with Mr. Cunningham, Dr. Welsh elected to proceed with prescribing medications for Mr. Cunningham's anxiety and sleep issues.

{¶32} Dr. Welsh next met with Mr. Cunningham on June 4, 2019. The doctor noted no evidence of psychosis and observed logical thinking. The doctor again met with Mr. Cunningham on August 27, 2019, when he requested to be evaluated for anxiety issues. At this meeting, Mr. Cunningham denied any "suicidal thinking" and, although he was "feeling down," the doctor did not think this symptom was "necessarily depression." While Dr. Welsh did not "rule out" psychosis, he still did not observe any evidence of psychosis and Mr. Cunningham's thought processes were clear and logical. Given the timeframe of Dr. Welsh's involvement with Mr. Cunningham between the time of the incident, Mr. Cunningham's statements and admissions, and his interviews, Dr. Welsh determined that Mr. Cunningham, when the incident occurred, experienced "likely a substance-abuse psychosis rather than another source of psychosis."

### b. Dr. Lynne Luna-Jones[6]

{¶33} Dr. Luna-Jones, who was a court-appointed expert, is a board-certified forensic psychologist. She has performed approximately 3,000 competency and sanity evaluations for courts, prosecutors, and attorneys. The doctor was asked by the trial court to perform a competency evaluation on Mr. Cunningham. On March 18, 2019, Dr. Luna-Jones issued the evaluation. The report was issued approximately three and one-half months after the murder.

{¶34} In her report, Dr. Luna-Jones stated Mr. Cunningham indicated that around November of 2018 his routines changed due to his drug use and he was regularly without

---

6. Dr. Luna-Jones' testimony took place over the course of the proceedings occurring on June 11 and 12, 2025.

Case No. 2025-P-0047

sleep. On December 31, 2018, Mr. Cunningham reported he had been awake for 36 to 72 hours straight.

{¶35} Dr. Luna-Jones stated that, according to his parents, Mr. Cunningham became paranoid at or around February 2017. His parents indicated he began to withdraw from society and had "completely quit coming to work" due to social anxiety.

{¶36} Dr. Luna-Jones, like Dr. Welsh, reported that Mr. Cunningham, upon his admission to the Portage County Jail, conceded he used methamphetamines intravenously. And, during January 4, 2019, he admitted his most recent use was December 31, 2018, the date of the murder. Dr. Luna-Jones stated Mr. Cunningham, at the time of the interview, showed signs of depression but did not appear overly "anxious, afraid, angry, embarrassed, or ashamed." Instead, he was alert and oriented, with an "appropriate affect, logical thought process, appropriate speech, [and] appropriate mood," and had no hallucinations.

{¶37} Dr. Luna-Jones reported that, at the time of the offense charged, Mr. Cunningham was diagnosed with a problematic pattern of stimulant use, particularly methamphetamine. She also noted that, at the time of the offense, Mr. Cunningham reported he was under the influence of methamphetamines. She determined Mr. Cunningham's intoxication with methamphetamines was voluntary. And Dr. Luna-Jones ruled out psychosis and/or adjustment disorder with anxiety. Mr. Cunningham denied experiencing delusional beliefs, auditory or visual hallucinations and, according to the doctor, there was no indication he was experiencing any perceptual disturbances during his evaluation.

{¶38} During the interview, Mr. Cunningham indicated that the best outcome for his case would be "if [he is] found not guilty by reason of insanity." Further, during the evaluation, Mr. Cunningham was able to discern and articulate the basic concepts of "legal guilt" versus "not guilty by reason of insanity." The record indicates, therefore, Mr. Cunningham was aware of the legal implications associated with a finding of "guilty" versus a determination of NGRI.

{¶39} Mr. Cunningham reported he stopped taking all his prescribed medications in September 2018 and commenced researching conspiracies. Mr. Cunningham advised Dr. Luna-Jones that he had concerns about L.C. being a "sociopath[.]" He advised the doctor his feeling never went away because, in Mr. Cunningham's view, L.C. would "lie" and he could never know "what was true" regarding her representations and behavior. Mr. Cunningham reported he thought L.C. was Satan; he admitted, however, that L.C. never made any threats to harm him that he took seriously.

{¶40} Dr. Luna-Jones stated Mr. Cunningham reported he injected methamphetamine around 6:00 a.m. on December 31, 2018. Mr. Cunningham was unsure of how much he used on that date because he lost "track of all this stuff." He told the doctor he wanted to scare L.C. and, in attempting to do so, punched her in the head. Mr. Cunningham then reported he shot L.C. and "killed the power" in the home to avoid being seen or "monitored."

{¶41} When Dr. Luna-Jones asked Mr. Cunningham about the wrongfulness of murdering L.C., he recognized his actions were wrong "because it ends a person's life without their consent." Mr. Cunningham also acknowledged his actions at the time of the incident were illegal.

{¶42} Considering the foregoing, Dr. Luna-Jones opined, based upon a reasonable degree of psychological certainty, that Mr. Cunningham did not have a severe mental defect at the time of the alleged offense. She emphasized that, on the day/night of the murder, she did not find Mr. Cunningham had any mental health problems other than those caused by his substance use (a fact he admitted to on the date of the murder) and maladaptive personality traits. Moreover, Dr. Luna-Jones opined, with a reasonable degree of psychological certainty, that Mr. Cunningham knew the wrongfulness of his actions when he assaulted and murdered L.C.

### c. Dr. Sara West[7]

{¶43} In April 2025, Dr. Sara West, a medical doctor and forensic psychiatrist, was asked to evaluate Mr. Cunningham as it related to his plea of NGRI. Dr. West issued a report on May 9, 2025. In the report, Dr. West cited all outside sources of information upon which she relied, including all previous reports issued by prior mental health professionals in the underlying case. While Dr. West offered her medical/psychiatric opinion on Mr. Cunningham's sanity as a result of her interview with him, she also engaged in a thorough comparison of Mr. Cunningham's history of evaluations with both the State's and defense's experts/witnesses.

{¶44} Specifically, after interviewing Mr. Cunningham, Dr. West became concerned with certain inconsistencies or mismatched information Mr. Cunningham provided with other psychiatric/psychological experts. Dr. West testified that due to certain inconsistencies reported throughout Mr. Cunningham's post-incident evaluations regarding his beliefs, behavior, and activities, she elected to focus on "information that

---

7. Dr. West's testimony occurred during the June 12, 2025 proceedings.

Case No. 2025-P-0047

was garnered in a fashion that was closest to the event[.]" Dr. West stated she "felt like that would be the most accurate reflection of the information given people's natural tendency to forget information." She punctuated this point by noting that Mr. Cunningham admitted to her, in the April 2025 interview, that he did not remember certain facts or features pertaining to the incident. Moreover, Dr. West testified that she found the inconsistencies problematic because they "mainly surrounded his reports regarding his use of methamphetamine. . . and voluntary intoxication with methamphetamine [which] is a very critical piece of information in relation to the assessment of his sanity in terms of this case."

{¶45} Dr. West elaborated:

> Because voluntary intoxication generally does not provide a severe mental illness in that one chooses to use methamphetamines and, therefore, the results of it are by choice than related to a severe mental illness . . . Some results of [extensive methamphetamine use] include, which I think [are] relevant in this case, reports of paranoia that would be a specific type of psychosis and then more generally psychosis which can include disorganization. I find that people who utilize meth may exhibit some common symptoms including . . . paranoia and a tendency to perseverate or focus on things and take them apart, so I guess that's the best way of describing it, taking apart phones, pulling apart electronics, digging in walls for wires, those kinds of things, so it stuck out to me that some of the features that were described that are consistent throughout Mr. Cunningham's report may very well be associated with methamphetamine use.

{¶46} Dr. West continued that Mr. Cunningham represented to Dr. James Karpawich that he had not used substances prior to the murder—a statement contradicted by both Dr. Luna-Jones' report and the intake report to which Dr. Welsh testified. Dr. West opined Mr. Cunningham's statements appeared fundamentally inconsistent because he both acknowledged methamphetamine use at or near the time

of the murder (and possibly after) but also denied the same to other expert evaluators. She observed that "I'm concerned about the discrepancies between [Mr. Cunningham's] report regarding his substance use. It is unclear to me, based on several reports, all of which cite a little bit different information, when he actually last utilized methamphetamine."

{¶47} Mr. Cunningham additionally reported to psychologist Dr. Steven Neuhaus, whose testimony will be addressed below, on May 5, 2019, that he had not used drugs on either December 30 or 31, 2018. Nevertheless, he reported to jail personnel and Dr. Luna-Jones he used methamphetamine on the day of the incident.

{¶48} Considering her interview, in relation to the various reports she evaluated, Dr. West provided the following diagnostic impressions of Mr. Cunningham on December 31, 2018: She determined Mr. Cunningham had a stimulant use disorder. In support, she cited Dr. Luna-Jones' report (which was issued shortly after the murder, in March 2019) wherein Mr. Cunningham stated he used larger amounts over longer periods and failed to fulfill major role obligations due to his methamphetamine use. Dr. West also determined Mr. Cunningham was experiencing stimulant intoxication on the day/night of the murder. She noted Mr. Cunningham presented evidence of "hypervigilance, interpersonal sensitivity, anxiety/tension/anger, stereotyped behaviors and impaired judgment. Additionally, he experienced the following signs or symptoms: psychomotor agitation and confusion."

{¶49} Finally, Dr. West determined Mr. Cunningham suffered from a substance-induced psychotic disorder. To this point, the doctor stated she considered that Mr. Cunningham may have been experiencing a primary psychotic disorder at the time of the

murder. She opined, however, his symptoms are more effectively explained by his methamphetamine use "as he has not experienced similar symptoms since maintaining long-term sobriety following his arrest."

{¶50} Dr. West concluded, with a reasonable medical certainty, that Mr. Cunningham was not suffering from a severe mental disease or defect on December 31, 2018. In support, Dr. West observed that although Mr. Cunningham was diagnosed with unspecified schizophrenia spectrum and other psychotic disorders at Coleman on December 30, 2018, he failed to directly report his substance use. Further, Mr. Cunningham expressed paranoid ideas while at his parents' home from January 1 to 3, 2019, and his mother explained she attributed these experiences to his "drug use." Dr. West opined that, without substance use, Mr. Cunningham has not experienced another psychotic episode since the date of the murder and has remained stable without sustained treatment with antipsychotic medications.

{¶51} Dr. West also determined, with a reasonable degree of medical certainty, that Mr. Cunningham knew the wrongfulness of his actions. In support, she pointed to certain, post-incident, circumstantial evidence that might lead to the reasonable inference that Mr. Cunningham knew his actions were wrong. Specifically, Mr. Cunningham, after he murdered L.C., "told [his children] the cops would be coming" and he expected them to take him away to jail for murder. Dr. West further noted that he advised his eldest son to keep his mother's death a secret from the grandparents (Mr. Cunningham's parents) because if the child said something, he could be going away to prison. Dr. West also emphasized he lied to his parents regarding L.C.'s whereabouts after the murder and prevented his father from entering the garage on the day he turned himself into

authorities. Finally, Dr. West found it important to note that Mr. Cunningham, after his father discovered L.C.'s body, began "chugging" a bottle of Captain Morgan because he knew he "was going to jail."

{¶52} Considering her evaluation, analyses of other reports, and independent assessment, Dr. West opined, with reasonable medical certainty, that Mr. Cunningham was not suffering from a severe mental disease or defect on the night of the murder and he had knowledge of the wrongfulness of his acts.

## 2. The Defense's Experts

### a. Dr. Robin Belcher-Timme[8]

{¶53} Dr. Timme, a board-certified forensic psychologist, testified on Mr. Cunningham's behalf.[9] Dr. Timme stated that, at the time of the offense, Mr. Cunningham was suffering from acute symptoms of a serious mental illness which included "[s]chizoaffective disorder, which is a combination of mood disorder, extreme depression, and a psychotic disorder, specifically, very delusional beliefs." Given these observations, Dr. Timme concluded that Mr. Cunningham was incapable of understanding the wrongfulness of his actions at the time of the incident.

{¶54} In formulating these opinions, Dr. Timme met with and interviewed Mr. Cunningham on February 28, 2024. Dr. Timme administered the Minnesota Multiphasic Personality Inventory, Third Edition ("MMPI-3"), a tool specifically designed to assess "severe psychopathology[.]" Dr. Timme pointed out that there was no indication Mr. Cunningham was attempting to manipulate the "clinical picture" through "feigning[,]"

---

8. Dr. Timme's testimony occurred during the proceedings which took place on June 9, 2025.
9. Dr. Timme, while he was being sworn in, stated he generally is referred to as "Dr. Timme" rather than Dr. Belcher-Timme. Given the doctor's expressed preference, we shall refer to him throughout as Dr. Timme.

Case No. 2025-P-0047

"over[-]endorsing symptoms[,]" or potential malingering. Dr. Timme also reviewed a separate test conducted on Mr. Cunningham in 2019, the MCMI-III, which, in the doctor's view, "described a man that was even more acutely psychotic . . . independent of drug use."

{¶55} Dr. Timme testified that he also reviewed Mr. Cunningham's mental health history in relation to "intergenerational transmission of addiction." Dr. Timme stated that "the research shows that about 75 percent of people who have a serious mental illness also struggle with co-occurring substance use disorder." Still, Dr. Timme testified there was no evidence that Mr. Cunningham was intoxicated or using substances on December 30, 2018, when he visited Coleman. And, Dr. Timme noted Coleman did not do a urine screen on that date.

{¶56} Dr. Timme asserted Mr. Cunningham's symptoms of psychosis were persistent at the time of his interview. As such, he took issue with Dr. Luna-Jones' and Dr. West's evaluations and conclusions. Dr. Timme testified:

> [T]here are moments in both of the reports [of Dr. Luna-Jones and Dr. West] that do describe some of the superficial elements of this psychotic disorder of delusions, that if they were drilled down on further I would - - I would surmise that they would discover that those were more psychotic than they are on the surface. There's a few other pieces of information that help us arrive at this conclusion as well. One is that anybody who gave psychological testing discovered that there was serious mental illness there. And each of those tests were fully valid. So this tells us two really important things that when we look at objective measures of mental health, not subjective, not a clinical opinion, but what does the Minnesota Multiphasic personality Inventory-3, MMPI-3, say, what does the Personality Assessment Inventory say, what does the Millon Clinical Multiaxial Inventory-III say, these are objective measures of psychopathology and they all arrive at valid conclusions that there are serious symptoms of mental illness here. So when we incorporate a multi-method approach, we

Case No. 2025-P-0047

start to see a Venn diagram where the clinical judgment overlaps with the result of psychological testing and we get a much more powerful opinion there.

{¶57} According to Dr. Timme, Mr. Cunningham was experiencing the same psychotic episode on the night of the murder that he was on the day before, when he called Brimfield Police. Dr. Timme opined that:

we like to think about a lot about dates, but for somebody in a psychotic episode[,] time blends. And when you talk to [Mr. Cunningham] about what happened, the 30th and 31st is really one episode. So, when he - - when the 31st rolls around, [Mr. Cunningham] is still in the same episode that he was in on the 30th. He is still holding these very firmly held beliefs and he believed that that day somebody was coming to actually hurt him, kill him, burn the house down, and that [L.C.] was a major player in this.

{¶58} As a result of his evaluation, Dr. Timme opined that Mr. Cunningham was experiencing a severe mental disease or defect at the time of the murder and he did not know that his actions were wrong.

## b. Dr. Thomas P. Swales[10]

{¶59} Dr. Thomas Swales is a board-certified clinical neuropsychologist. In September 2024, Dr. Swales performed an independent psychological evaluation of Mr. Cunningham's family mental health. The evaluation involved interviewing several of Mr. Cunningham's family members and assessing Mr. Cunningham's general family history for mental illness. Dr. Swales' investigation revealed that the family had numerous instances of severe mental disease (including schizoaffective disorder, bipolar disorder, paranoid schizophrenia, depression, as well as anxiety). He opined that such disorders

---

10. Dr. Swales' testimony was received during proceedings which occurred on June 10, 2025.

Case No. 2025-P-0047

are genetic in nature and the occurrence of psychotic disorders in blood-relatives is a recognized risk factor for development of such disorders.

{¶60} Dr. Swales opined, based upon his knowledge, training, and experience, that if an individual was experiencing substance-abuse psychosis, and that individual later achieves a level of sobriety, one would expect those psychotic symptoms to resolve. When Dr. Swales interviewed Mr. Cunningham in September 2024, however, the doctor opined he was still having symptoms of delusions, paranoia, and persecutory disorders. Dr. Swales testified that "[t]he common thread throughout all [the] evaluations from all the forensic examiners who performed sanity evaluations, from what I've seen, all described an individual who has had a psychotic disorder, whether it be schizoaffective disorder, delusional disorder, major depressive disorder with psychotic features or schizoaffective disorder." In Dr. Swales' view of the record, "[e]veryone agrees [Mr. Cunningham] has a psychotic disorder." Because Dr. Swales did not conduct a sanity evaluation personally on Mr. Cunningham, however, he did not provide an opinion on this point.

### c. Dr. Stephen Neuhaus[11]

{¶61} Dr. Neuhaus is a licensed psychologist with a clinical and forensic practice who has been qualified as an expert in forensic psychology in various state and federal courts. Dr. Neuhaus interviewed Mr. Cunningham on four occasions between May and July 2019.

{¶62} Dr. Neuhaus reported that Mr. Cunningham had various paranoiac thoughts regarding L.C.'s alleged cheating and, in 2016, believed he was subject to some form of reality television show. Dr. Neuhaus observed that Mr. Cunningham decided to

---

11. Dr. Neuhaus' testimony occurred during the proceedings taking place on June 11, 2025.

Case No. 2025-P-0047

discontinue taking psychological medications in August 2018. Mr. Cunningham noted that he had been suspicious of his wife and felt she was a "psychopath" and that she was using him for some unspecified, but flagitious purpose. He claimed not to know who she was and believed she might be trying to kill him. Mr. Cunningham admitted to Dr. Neuhaus that he began believing L.C. had homicidal thoughts towards him "[a] little bit before Christmas, around December 5, 2018." Mr. Cunningham stated he attempted to ignore these thoughts but still maintained L.C. was involved in a conspiracy, with some outsider, to kill him.

{¶63} Dr. Neuhaus noted that Mr. Cunningham recalled notifying police on December 30, 2018, the day before the murder. During that episode, Mr. Cunningham suggested that there was a conspiracy of insurance fraud and that he was a target. He also disclosed that he believed his children were a target of the conspiracy.

{¶64} Mr. Cunningham disclosed that he either stopped sleeping or was sleeping less, a lot less, around Christmas 2018. He emphasized that he believed "they" were "going to kill me!" Mr. Cunningham stated to Dr. Neuhaus that he began to wonder if L.C. was involved in some form of pedophilia network because he had been doing research about criminal pedophile rings and referenced "Pizzagate."

{¶65} Mr. Cunningham stated an incident took place at or around Christmas 2018 where he punched L.C. in an attempt to compel her to admit her involvement in his beliefs. He admitted to punching her "two or three times on top of her head. [He] was trying to scare her into telling [him]." According to Dr. Neuhaus, Mr. Cunningham maintained L.C. would neither deny nor confirm his worries.

{¶66} Dr. Neuhaus noted that Mr. Cunningham admitted he shot L.C. around 7:00 or 7:30 p.m. on New Year's Eve, 2018. Mr. Cunningham told the doctor he "thought she was Satan," and that Mr. Cunningham "was convinced that he had to shoot his wife in order to remain alive."

{¶67} Dr. Neuhaus also interviewed Mr. Cunningham's parents, who disclosed there were various mental health issues within Mr. Cunningham's biological family. These factors provided Dr. Neuhaus with additional information regarding mental health risk factors that might be relevant to his professional evaluation.

{¶68} Dr. Neuhaus additionally testified that he considered aspects of Mr. Cunningham's developmental history from childhood into adolescence and adulthood. He noted "[t]here were beginning to be difficulties when he was 12 years of age with both anxiety, social discomfort, reports of having been bullied at school, gradual difficulties, social isolation and social avoidance, substance issues, alcohol, drugs of various sorts. . . ." Dr. Neuhaus observed that these points suggest "risk factors" regarding adjustment difficulties and mental health and psychiatric difficulties. "[R]isk in terms of relationships, forming and maintaining, you know, intimate relationships, and for me it was sort of the foundational issues, you know, for chronic mental illness."

{¶69} Considering the foregoing, Dr. Neuhaus opined that, with a reasonable degree of psychological certainty, at the time of the murder, "Mr. Cunningham was suffering from a severe mental disease, namely a delusional disorder, and as a result of the mental disease, it was also my opinion with reasonable psychological certainty that it rendered him unable to understand the wrongfulness of his actions at the time."

#### d. Dr. James Reardon[12]

{¶70}  Dr. Reardon is a psychologist who has practiced for 48 years and conducted 400 to 500 sanity evaluations and consulted in over 2,000 legal cases during his career.

{¶71}  Dr. Reardon met with Mr. Cunningham in two sessions on January 19 and 20, 2020. Mr. Cunningham reported his belief that he was targeted to be killed based upon a conspiracy involving L.C. Due to his concerns, Mr. Cunningham indicated he tried to keep himself awake in order to "be vigilant." Dr. Reardon indicated there is a high correlation amongst factors such as increased irrationality delusion in conjunction with sleep deprivation. Given his view of the evidence and his meetings with Mr. Cunningham, Dr. Reardon testified that Mr. Cunningham was suffering from a delusional disorder at the time he murdered L.C.

{¶72}  Dr. Reardon reported that during his interviews with Mr. Cunningham, he considered multiple records, including, but not limited to Dr. Luna-Jones' March 2019 report and Dr. Neuhaus' August 2019 report. Dr. Reardon found certain features of Dr. Luna-Jones' report problematic. Dr. Reardon stated Dr. Luna-Jones described "what appears to be clearly paranoid and delusional ideation that Mr. Cunningham manifested through the fall of 2018." Dr. Readon also observed that Dr. Luna-Jones acknowledged Mr. Cunningham may have been in a psychotic state at the time of the offense, but she reported that this was a result of his voluntary intoxication with methamphetamine. According to Dr. Reardon, Dr. Luna-Jones unnecessarily attributed Mr. Cunningham's psychosis to voluntary intoxication, rather than an actual mental disease. Moreover, Dr. Reardon took issue with Dr. Luna-Jones' viewpoint because it apparently did not account

---

12. Dr. Reardon's testimony was taken during proceedings occurring on June 10, 2025.

Case No. 2025-P-0047

for Mr. Cunningham's urinalysis results from September and October of 2018, which indicated Mr. Cunningham did not use any unprescribed substances during that period.[13]

{¶73} Dr. Reardon explained that, after conducting several different psychological tests, Mr. Cunningham, in his opinion, was not malingering and his posture was "congruent with a potential psychotic depressive disorder and with a delusional disorder or delusional process." Dr. Reardon determined Mr. Cunningham did not know the wrongfulness of his actions when he murdered L.C. Indeed, the doctor testified "at the time of the offenses [Mr.] Cunningham was in a psychotic state unable to discern reality and unable to appreciate wrongfulness." Accordingly, Dr. Reardon also determined that Mr. Cunningham suffered from a severe mental illness at the time of the murder.

## C. Analysis of the Elements of the Affirmative Defense of NGRI

{¶74} As noted above, a person is not guilty by reason of insanity "only if the person proves . . . that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14).

### 1. Severe Mental Disease or Defect

{¶75} As discussed, three of Mr. Cunningham's experts opined he suffered from a severe mental disease or defect at the time of the murder (*See* Dr. Timme's, Dr. Neuhaus', and Dr. Reardon's testimony). Mr. Cunningham's fourth expert, Dr. Swales,

---

13. We note that even if Dr. Luna-Jones did not account for the urinalysis results that Dr. Reardon found important, any such results would have occurred two to three months *before* the murder. Nevertheless, Dr. Neuhaus reported that, even though Mr. Cunningham denied abusing any drugs during September and October of 2018, Mr. Cunningham "did indicate that he used methamphetamine on five occasions in November 2018. . . ." Also, the issue of chronic-habitual use of intoxicants will be addressed below.

Case No. 2025-P-0047

testified that an individual like Mr. Cunningham had a higher probability of potentially severe mental health concerns when it runs in one's family.

{¶76} The trial judge, however, also received evidence that Mr. Cunningham's mental health issues on the night of the incident were triggered or exacerbated by his voluntary use of methamphetamine. (*See* Dr. Luna-Jones' and Dr. West's testimony). Moreover, Dr. Welsh provided additional testimony that Mr. Cunningham, at the time of the murder, was experiencing substance-abuse psychosis rather than a separate, independent form of psychosis.

{¶77} The evidence at trial provided diverging professional perspectives. The trial court also heard, however, that upon surrendering to PCSO, Mr. Cunningham admitted to using drugs on the night of the murder, specifically methamphetamine. This admission was noted by a jail nurse (or nurses) on an evaluation form, dated January 4, 2019, that Mr. Cunningham admitted to using methamphetamine on day of the incident. Dr. Welsh underscored this point in his testimony, pointing out that on that date Mr. Cunningham reported to jail nurses that his last use of methamphetamine was "New Year's Eve."

{¶78} Also, Dr. Luna-Jones, who interviewed Mr. Cunningham in March 2019, only three and one-half months after the murder, reported Mr. Cunningham admitted his last use of methamphetamine was on December 31, 2018, the date of the murder.

{¶79} Moreover, even Dr. Neuhaus testified that Mr. Cunningham admitted to using methamphetamine multiple times in November 2018, roughly a month before the murder. Although there is an inconsistency regarding Mr. Cunningham's admissions of methamphetamine use, there is also a pattern that he initially indicated use on the day of the murder and consistent use within a month prior to the murder.

Case No. 2025-P-0047

{¶80} Mr. Cunningham argues the *lack* of toxicological evidence indicates there was insufficient evidence he was using methamphetamine at the time of the incident. We do not agree with Mr. Cunningham's premise or its conclusion.

{¶81} As discussed throughout this opinion, there was evidence submitted by the initial correctional officer as well as other experts that Mr. Cunningham ingested methamphetamine on the date of the murder. There was also ample evidence that Mr. Cunningham had a pattern of usage of methamphetamine in the months leading to the murder. Moreover, there was also credible, compelling evidence that methamphetamine use causes the symptoms Mr. Cunningham claimed to experience prior to the incident. These symptoms, paranoia and delusional thoughts, were buttressed by the objective evidence that the Cunningham family residence was torn asunder due to Mr. Cunningham's odd belief that L.C., along with police and other operatives, were plotting to kill him. Mr. Cunningham disassembled electronic children's toys, opened holes in the home's walls looking for evidence of untoward monitoring systems, and took apart other devices or electronic equipment looking for bugs.

{¶82} This evidence, viewed alongside the evidence of Mr. Cunningham's ostensible consistent use of methamphetamine prior to the incident (which causes substance-oriented psychosis), demonstrates the lack of a toxicology report was not fatal to the State's position that Mr. Cunningham did not suffer from a severe mental disease or defect.

{¶83} Mr. Cunningham also acknowledges the well-known rule that voluntary intoxication will typically preclude the use of an NGRI defense. *See, e.g., Toth*, 52 Ohio

St.2d at 210. He directs this court to legal precedent that permits the defense where such intoxication is "habitual and chronic."

{¶84} In *Rucker v. State*, 119 Ohio St. 189, 196 (1928), the Supreme Court of Ohio observed: "'The distinction between a fit of drunken frenzy or madness, commonly called 'delirium tremens,' and temporary delusional insanity, a disease caused by excessive and long-continued indulgence in alcoholic liquors, technically called . . . '*mania a potu*,' is well defined by the authorities and text-writers.'" *Id.*, quoting *Cheadle v. State*, 11 Okl. Cr. 566 (1915); *see also Toth* at 210 (observing that "[i]t is a well-established rule in Ohio that the defense of insanity cannot be successfully established simply on the basis that the condition resulted from the use of intoxicants or drugs, where such use is not shown to be habitual or chronic." (Citing *Rucker* at paragraph three of the syllabus.)).

{¶85} The Court in *Rucker* continued:

> "The principle is everywhere recognized that voluntary intoxication is no justification or excuse for crime, and is no excuse for homicide, though carried to the extent of producing incapacity to control the mind and will, while intoxication does not excuse homicide, it may produce a state of mind in which one is incapable of forming a design to take life, and evidence of intoxication is admissible only as bearing upon the existence or nonexistence of malice. *Miller v. State*, 9 Okl. Cr. R. 55 . . . ."

*Rucker* at 196, quoting *Cheadle*.

{¶86} Mr. Cunningham claims that the trial court lost its way when it determined he failed to meet his burden of persuasion regarding NGRI because the State only presented "*some* evidence of current or past intoxication." (Emphasis sic.) Under the circumstances of this case, we conclude the "habitual-chronic-intoxication" rule set forth in *Rucker* and *Toth*, while worthy of consideration in light of the totality of the evidence,

does not undermine the trial court's conclusion that Mr. Cunningham failed to establish persuasive evidence that he was NGRI at the time of the murder.

{¶87} There was evidence that Mr. Cunningham used methamphetamines regularly from November to December 2018. The expert testimony, however, was inconsistent regarding whether this potential longitudinal use indicated a "disease caused by excessive and long-continued indulgence." *Rucker*, 119 Ohio St. at 196. Moreover, Dr. West's evaluation of Mr. Cunningham's post-sobriety presentation supported the State's position that Mr. Cunningham was experiencing a "substance-induced psychosis" at the time of the murder.

{¶88} Moreover, to the extent that Mr. Cunningham argues that the State's theory of intoxication could somehow assist his defense, that position is belied by the record. The State recognized that Mr. Cunningham experienced cycles of drug use, established by evidence that he used more significantly in November 2018 and also during December 2018, culminating in his use on the day of the murder. The time periods of Mr. Cunningham's use, coupled with the various experts who testified that Mr. Cunningham manifested no obvious signs of psychosis during interviews with the experts, militates strongly in favor of the trial court's determination that Mr. Cunningham voluntarily induced any potential psychosis via methamphetamine use. In this respect, the evidence suggests the *Rucker* and *Toth* line of cases do not assist Mr. Cunningham's appeal.

{¶89} We acknowledge that Mr. Cunningham presented evidence of paranoia, delusional thoughts, as well as depression. His experts as well as the State's experts appeared to concede these mental issues can be evidence of mental illness. Nevertheless, we are not persuaded, considering the substantial evidence that Mr.

Case No. 2025-P-0047

Cunningham admitted to using methamphetamine, to various individuals, on the night of the murder, that his mental illness(es) was/were sufficient to constitute a severe mental disease or defect. In other words, Mr. Cunningham's possible mental illness does not, unto itself, necessitate a conclusion that he suffered from a severe mental disease or defect, especially where there is persuasive evidence that the mental episode which occasioned the murder was voluntarily induced by methamphetamine use.

{¶90} The term "intoxication" includes intoxication resulting from the ingestion of a drug. R.C. 2901.21(F)(4). Voluntary intoxication is not an affirmative defense and "may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense." R.C. 2901.21(E).

{¶91} Moreover, having a mental illness is not tantamount to legal "insanity." *State v. May*, 2008-Ohio-1731, ¶ 7 (1st Dist.) The insanity defense is thus available only to those suffering severe mental disease or defect, not just any mental-health issue. Mr. Cunningham's arguments that he may have suffered from some mental illness at the time of the offense does not overcome the other compelling evidence that any such illness was not the primary cause of his behavior on the night of the incident. The evidence of Mr. Cunningham's admitted use of methamphetamine provided a sound, persuasive foundation for the trial court's determination on the first prong of the NGRI test.

{¶92} Finally, *Rucker,* 119 Ohio St. 189, indicates that while voluntary intoxication does not justify or excuse a homicide, it may provide a basis for negating the mens rea for taking a life. In this matter, as just noted, evidence of Mr. Cunningham's voluntary intoxication did not suggest that he was incapable of formulating the necessary intent for committing the murder. According to expert testimony, Mr. Cunningham had suspicions

Case No. 2025-P-0047

that L.C. was involved in a plot to have him killed and, as a result, he purposefully killed her. Because we conclude (1) there was adequate, credible evidence to support a conclusion that Mr. Cunningham's psychosis was voluntarily induced and (2) evidence was adduced that Mr. Cunningham had the requisite intent to commit the alleged murder, the evidence did not support the argument that he lacked the state-of-mind to commit the murder.

{¶93} The expert testimony was not consistent regarding Mr. Cunningham's representations of the timing of his methamphetamine use. "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). The decision to afford credit to the testimony of particular witnesses is within the unique realm of the factfinder who has observed and heard the witnesses. *Id.* The trier of fact, accordingly, "is free to believe all, some, or none of the testimony of each witness appearing before it." (Citation omitted.) *State v. Grant*, 2020-Ohio-3055, ¶ 50 (2d Dist.).

{¶94} With these points in mind, the trial court could reasonably conclude that Mr. Cunningham was experiencing a possibly transient, substance-induced psychotic disorder on the night of the murder. Thus, the court could also reciprocally conclude that Mr. Cunningham failed to establish by a preponderance of the evidence that, on the night of the incident, he suffered from a severe mental disease or defect. We cannot say that the trial court lost its way in determining, by a preponderance of the evidence, Mr.

Case No. 2025-P-0047

Cunningham failed to establish he was not experiencing a severe mental disease or defect.

### 2. Knowledge of Wrongfulness of Actions

{¶95} The statute governing the insanity defense requires a defendant to establish, at the time the offense was committed, the defendant did not know the wrongfulness of his or her acts, and the action was a result of a severe mental disease or defect. R.C. 2901.01(A)(14). The affirmative defense accordingly requires a defendant asserting the same to establish both the "mental disease" prong and the "knowledge" prong. The prongs, or "propositions" requiring proof, assert a relationship of dependence and, as such, are conjunctive in nature. Without establishing the "mental disease" prong, therefore, the "knowledge" component is irrelevant. Accordingly, given our conclusion on the "mental disease" element, we need not necessarily address the "wrongfulness" aspect of the test; for comprehensiveness, however, we shall explain why, even if there was a possible question regarding the "mental disease" element, the trial court did not err in concluding Mr. Cunningham failed to establish NGRI because there was ample, persuasive evidence Mr. Cunningham knew the wrongfulness of his actions.

{¶96} The evidence established that Mr. Cunningham recognized the wrongfulness of his actions explicitly to Dr. Luna-Jones. In particular, when asked by the doctor regarding the wrongfulness of his actions pertaining to the incident, Mr. Cunningham conceded they were wrong and illegal. Significantly, he emphasized his actions were wrong because he ended L.C.'s life without her "consent." Further, Mr. Cunningham acknowledged the wrongfulness of his actions to Dr. West.

Case No. 2025-P-0047

{¶97} The NGRI statute requires that a defendant establish, *at the time of the offense*, the alleged offender did not know the wrongfulness of his or her actions. Contemporaneous and/or near contemporaneous, post-event acts, furtive or otherwise, are probative of a defendant's state of mind *at the time of the offense. See State v. Myers*, 2010-Ohio-4602, ¶ 17 (10th Dist.) (In an appeal from a conviction rejecting the defense of NGRI, the court determined "[t]here is evidence . . . showing that appellant understood the wrongfulness of his actions. Appellant engaged in furtive conduct reflective of a consciousness of guilt. He tried to conceal his identity during the shooting, he hid his face while he drove by the victim's house, and he removed the temporary license tag from his car. He washed his clothes after the shooting, having knowledge that police would test evidence for gunshot residue. Although there was conflicting evidence on whether appellant sped away after the shooting, it is undisputed that he fled to another city afterward, and this flight is evidence of a consciousness of guilt." (Citations omitted.) As we have previously pointed out, there is no question that Mr. Cunningham committed the offense. His actions, after the incident, however, circumstantially support the expert opinions that he understood the wrongfulness of his actions *at the time of the incident.*

{¶98} For instance, Dr. Timme acknowledged and it is not disputed that Mr. Cunningham shut off the power in the home after the murder because he feared neighbors heard the shot and would call police. This demonstrates a cognizance that "shots fired," let alone "shots fired" that kill a person, could necessitate a law enforcement presence. Mr. Cunningham accordingly had knowledge that avoiding attention, in general, and the attention of law enforcement, in particular, would be important. In this respect, Mr. Cunningham believed that any attention focused upon his residence after the incident

Case No. 2025-P-0047

would be legally or morally problematic. In this regard, his actions indicate he knew the murder was wrong.

{¶99}  Further, Mr. Cunningham told his parents, after the murder, that L.C. was with friends on New Year's Day and would not join the family for dinner. This point underscores that Mr. Cunningham had knowledge that if he told his parents what truly occurred, he would be in some form of moral or legal trouble, i.e., he knew explaining the actual facts would place him in peril because he knew his actions were wrong.

{¶100} Also, Dr. West noted that Mr. Cunningham told his children that, after the murder, the police would be coming and would likely take him to jail. He also advised his eldest son to keep the incident a secret because, if the children's grandparents found out, he could go to prison.

{¶101} Finally, Mr. Cunningham advised his father, P.C., on January 3, 2019, not to enter the garage where he left L.C.'s body. It fundamentally follows that Mr. Cunningham's advisement to P.C. *not* to enter the garage shows a consciousness and knowledge of the legal or moral gravity of his actions, i.e., a knowledge of wrongfulness.

{¶102} Each of these additional points support a recognition and awareness that Mr. Cunningham knew, at the time he killed L.C., his actions were wrong.

{¶103} We point out that "[t]he existence of mental illness, without more, does not demonstrate an inability to comprehend the difference between right and wrong." (Citation omitted.) *State v. Arnold*, 2025-Ohio-2547, ¶ 33 (6th Dist.). As noted above, even if Mr. Cunningham had some mental illness, latent or otherwise, that had some causal relationship to his actions that was exacerbated by his voluntary, drug-induced psychosis,

the evidence demonstrated he knew his actions were wrong. Mr. Cunningham failed to establish this prong of the NGRI test by a preponderance of the evidence.

{¶104} In light of the evidence, the trial court did not err or lose its way in concluding Mr. Cunningham failed to establish both elements of the defense of NGRI.

{¶105} Mr. Cunningham's first assignment of error lacks merit.

**IV. Second Assignment of Error: Did the Trial Court Commit Prejudicial Error by Allowing Dr. West to Utilize a Prior Report from a Non-Testifying Expert as a Foundation for her Opinion?**

{¶106} Mr. Cunningham's second assignment of error specifically reads:

{¶107} "The trial court committed prejudicial error and violated appellant's rights under the Confrontation Clause of the Sixth Amendment and of Section 10, Article 1 of the Ohio Constitution by allowing experts to testify to the out of court statements and opinions of another expert who was not subject to cross-examination."

{¶108} Under this assigned error, Mr. Cunningham argues that the trial court violated his right to confrontation by allowing the State to present testimony from an expert witness, Dr. Karpawich, by way of Dr. West, without affording him the opportunity to cross-examine Dr. Karpawich. We do not agree with Mr. Cunningham's argument.

**A. Legal Standard**

{¶109} The Confrontation Clause prohibits the admission or use of testimonial statements of a witness who does not appear at trial unless that witness is unavailable to testify, and the defendant has had a prior opportunity for cross-examination. *Crawford v. Washington,* 541 U.S. 36, 68 (2004). The Sixth Amendment right to confrontation, however, may only be invoked under situations where hearsay is offered into

Case No. 2025-P-0047

evidence. *Id.* at 60, fn. 9. Hearsay is a statement, other than one made by a declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Evid.R. 801(C).

{¶110} We recognize that "[t]he Ohio Constitution is a document of independent force" and—subject to the Supremacy Clause—courts are "unrestricted" in interpreting it independently from the United States Constitution. *Arnold v. Cleveland*, 67 Ohio St.3d 35 (1993), paragraph one of the syllabus. Nevertheless, Article I, Section 10, Ohio's parallel Confrontation Clause, has been construed "in lockstep with the United States Supreme Court's interpretation of the Sixth Amendment." *State v. Carter*, 2024-Ohio-1247, ¶ 34; *State v. Self*, 56 Ohio St.3d 73, 79 (1990). *See also State v. Brown*, 2026-Ohio-1807, ¶ 8 (11th Dist.), quoting *State v. Arnold*, 2010-Ohio-2742, ¶ 12, quoting *Self* at 79 ("'While these constitutional provisions are not identical, '"the Ohio Constitution provides no greater right of confrontation than the Sixth Amendment."'"). Accordingly, our analysis of Mr. Cunningham's argument under the United States Constitution envelops the analysis as it pertains to the Ohio Constitution.

{¶111} Although defense counsel did not object to Dr. West's reference to Dr. Karpawich's report during her testimony, counsel did object to the use and/or discussion of Dr. Karpawich's report during Dr. Timme's testimony. During Dr. Timme's testimony, defense counsel objected to the State's reference to Dr. Karpawich's report, stating "Dr. Karpawich is not testifying. I've got a whole crate of questions for Dr. Karpawich if he were testifying, but he's not testifying here." The trial court overruled the objection, pointing out counsel was able to review the report and thus Dr. Timme could comment upon it. Even though counsel did not premise his objection upon a hearsay/Confrontation-

Clause basis, the issue was preserved. We therefore review the trial court's judgment relating to the alleged improper introduction of purported hearsay evidence de novo. *State v. Miller*, 2020-Ohio-3854, ¶ 31 (11th Dist.). When an appellate court reviews a trial court's decision de novo, it does so without deference to the trial court's conclusion. *State v. Thomas*, 2024-Ohio-5872, ¶ 8 (11th Dist.).

## B. Analysis

{¶112} Mr. Cunningham primarily relies upon the United States Supreme Court's decision in *Smith v. Arizona*, 602 U.S. 779 (2024) to support his position. In *Smith*, the United States Supreme Court recognized that the Confrontation Clause prohibits the prosecution from introducing "the testimonial out-of-court statements of a forensic analyst at trial, unless [he or] she is unavailable and the defendant has had a prior chance to cross-examine [him or] her." *Id.* at 802-803. The Court observed the Confrontation Clause additionally prohibits the prosecution from introducing "those statements through a surrogate analyst who did not participate in their creation." *Id.* at 803. Finally, the Court in *Smith* determined that the Confrontation Clause prohibits a witness from relying on an absent analyst's findings as the basis for the witness' own "independent opinion[.]" *See id.* at 790-791, 803. "Approving that practice would . . . allow for easy evasion of the Confrontation Clause." *Id.* at 798. This would imply that "every testimonial lab report could come into evidence through any trained surrogate, however remote from the case. And no defendant would have a right to cross-examine the testing analyst about what [he or] she did and how [he or] she did it and whether [his or] her results should be trusted." *Id.* at 799.

Case No. 2025-P-0047

{¶113} Although Mr. Cunningham treats Dr. West as a surrogate for Dr. Karpawich's report and conclusions, nothing indicates the former adopted the latter's conclusions as the latter's "independent opinion" or treated the same as the "truth of the matter asserted." Dr. West offered an independent evaluation and analysis of Mr. Cunningham. She acknowledged she utilized previous expert reports for purposes of review and to compare as well as contrast her determinations.

{¶114} Dr. West testified that, as an expert in her field of forensic psychiatry, she relies on the evaluations, opinions, and conclusions of other experts. Utilizing information and the opinions of others does not automatically indicate the use of the evaluations was designed to advance the non-testifying expert's opinion for the truth of its conclusions.

{¶115} This matter was tried to the bench, before an experienced trial judge. The trial judge is presumed to disregard improper testimony, including hearsay. *See, e.g., In re J.C.*, 2018-Ohio-2234, ¶ 24 (8th Dist.). Hence, even if the evidence were hearsay (which we conclude it was not), the trial judge was capable of disregarding the improper testimony. Moreover, Evid.R. 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." The foundational material considered by Dr. West, especially when not used as a substantive basis of her conclusion, can be reasonably deemed as a basis for Dr. West's ultimate opinion.

{¶116} In this regard, we maintain an expert may rely on such information provided that the source is not offered as independent substantive evidence for the truth of the matter(s) asserted. So long as the information included in the report serves only as

Case No. 2025-P-0047

a background for the testifying expert's evaluation and conclusion, we perceive no hearsay problem and therefore no Confrontation-Clause problem.

{¶117} In short, Dr. West's evaluation and opinion was not simply a restatement of Dr. Karpawich's diagnostic opinion. She offered her own separate assessment and opinions. Of course, her understanding of the background of the case was informed by the assessments of previous expert evaluations. Still, Dr. West stated she utilized these prior reports as a means of comparing and contrasting the experts' relative observations towards the end of identifying possible consistencies or inconsistencies. This was merely a backdrop which allowed Dr. West to formulate her own, personal expert opinion, after interviewing Mr. Cunningham, regarding her substantive expert conclusions regarding his sanity.

{¶118} We accordingly conclude there was no error when the trial court permitted Dr. West to testify regarding the background information included in Dr. Karpawich's report.

{¶119} Mr. Cunningham's second assignment of error lacks merit.

### V. Conclusion

{¶120} The trial court did not lose its way in concluding that Mr. Cunningham failed to meet his burden of persuasion on his NGRI defense. Moreover, Dr. West's reliance on a non-testifying expert's report as background information, rather than as substantive evidence offered for the truth of the matter asserted, did not violate the Confrontation Clause. We accordingly affirm the trial court's judgment.

MATT LYNCH, P.J.,
ROBERT J. PATTON, J.,
concur.

Case No. 2025-P-0047

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
PRESIDING JUDGE MATT LYNCH,
concurs

_____
JUDGE ROBERT J. PATTON,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-P-0047